**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210272-U

Order filed October 29, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* C.R., C.R. Jr., K.R., K.B. and J.B., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors | ) | Peoria County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-21-0272, 3-21-0273, |
| Petitioner-Appellee, | ) | 3-21-0274, 3-21-0275, 3-21-0276 |
| | ) | Circuit Nos. 17-JA-15, 17-JA-17, |
| v. | ) | 17-JA-18, 18-JA-128, 19-JA-139 |
| | ) | |
| D.B., | ) | |
| | ) | Honorable Timothy J. Cusack, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Daugherity and Lytton concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's judgment terminating respondent's parental rights is
             supported by the manifest weight of the evidence.

¶ 2    Respondent, D.B., appeals from the termination of her parental rights. For the reasons that

follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    There are five minors involved in these consolidated appeals, C.R., C.R. Jr., K.R., K.B., and J.B. On January 24, 2017, the Department of Children and Family Services (DCFS) filed petitions for adjudication of neglect as to C.R., C.R. Jr., and K.R. The petition alleged that four days earlier police found the minors at home, unsupervised, along with other minors, with the oldest child being six-year-old N.H. The minors ranged from six years old to one. D.B. told N.H. that she was leaving, and he was to watch the other children. N.H. had watched the minors before. An uncle was supposed to pick them up in the morning, but the uncle never came. The home was disheveled with clutter and trash throughout. A baby crib filled with items blocked the main entrance to the home. Upon inspection of the home, police found a minor with a diaper full of feces, additional feces filled diapers were found in the bathroom. Police also observed a closed door and carpet with fire damage. One of the minor's reported he had started a fire in the home a few days prior. A five-year old gave one of the officers an undischarged bullet. When medical personnel examined the minors, another undischarged bullet was found in N.H.'s mouth. The minors had been home alone from 11:30 p.m. on January 19 to 7:30 a.m. on January 20. D.B. arrived home at 9:30 a.m.

¶ 5    The petition also alleged that D.B. had a criminal history, including unlawful use of a weapon in 2009; two charges of possession/consumption of alcohol by a minor in 2011; and retail theft in 2013. D.B. was previously indicated by DCFS on September 5, 2012, for medical neglect and failure to thrive. In addition, there was domestic violence between D.B. and the father of C.R., C.R. Jr., and K.R. In September 2013, the father of those minors bit D.B. on the arm twice and D.B. hit the father with an object or a knife. Both D.B. and the father sustained injuries. In March 2013, the father hit D.B. in the head and face, proceeding to slam her head into a sidewalk resulting in injury.

¶ 6    The court entered orders for temporary shelter care for C.R., C.R. Jr., and K.R. the same day the petitions for adjudication of neglect were filed. In March 2017, the court entered adjudication of neglect orders and dispositional orders, finding D.B. unfit owing to the fact she left several minors at home alone overnight. The court required D.B. to cooperate with DCFS; comply with the service plan; correct the conditions that brought the children into DCFS's care; perform two random drug drops per month; submit to a psychological examination and follow recommendations; participate in and successfully complete counseling; obtain and maintain stable housing; notify caseworker of any change of address; visit with the minors as scheduled; and maintain employment or legal source of income.

¶ 7    On March 26, 2018, DCFS filed a petition for adjudication of neglect as to K.B., born on March 22, 2018. Among other things, the petition alleged D.B. was previously found unfit without a subsequent finding of fitness. In June 2018, the court entered an adjudication order and then a dispositional order, finding D.B. unfit and ordered her to complete the tasks previously mandated.

¶ 8    On May 17, 2019, DCFS filed a petition for adjudication of neglect as to J.B., born on May 14, 2019. The petition parroted the allegations made in K.B.'s petition for adjudication the year prior. The court entered an adjudication order and then a dispositional order finding D.B. unfit.

¶ 9    On October 20, 2020, the State filed petitions to terminate D.B.'s parental rights. The allegations included that D.B. was unfit pursuant to section 1D(m)(ii) of the Adoption Act (750 ILCS 50/1D(m)(ii) (West 2020)) in that she failed to make reasonable progress toward the return of the minors during the nine-month period of October 3, 2018, to July 3, 2019, as to C.R., C.R. Jr., K.R., and K.B. and July 26, 2019, to April 26, 2020, as to J.B. The caseworker for Family Core filed a best interest report in February 2021, with an addendum filed in April.

¶ 10 The court held a hearing on the petitions to terminate in June 2021. D.B. failed to appear at that hearing. Counsel for D.B. stated that he had an e-mail exchange with D.B. in early May and that he stressed the importance of her presence at the hearing. Counsel had not heard back from D.B. since then. Following the presentation of evidence by the State, the court found the petition had been proven and immediately moved onto the best interest hearing. Two caseworkers from Family Core testified during the best interest portion. Neither had been able to contact D.B. since May 5, 2021. The State requested the termination of D.B.'s parental rights. The guardian *ad litem* (GAL) agreed D.B.'s parental rights should be terminated. The lower court applied the best interest factors and based on the evidence found the factors favored termination of D.B.'s parental rights.

¶ 11 D.B. appeals.

¶ 12 II. ANALYSIS

¶ 13 D.B. argues the trial court's order terminating her parental rights is against the manifest weight of the evidence. The argument section of her brief is one paragraph, consisting of five sentences, that covers less than half a page. The State argues that D.B.'s conclusory argument absent citation to factual or legal support invites forfeiture. Our review of D.B.'s scant argument on appeal leads us to the conclusion that D.B. is challenging the circuit court's best interest finding and not the fitness finding. Essentially, she argues the best interest report and the application of the evidence to the statutory best interest factors weigh against terminating her parental rights. Further, she claims the best interest report proves that she "engaged in and/or completed all or her court ordered services."

¶ 14 When considering whether the termination of parental rights serves the best interest of the child, a court is tasked with weighing and balancing the following factors: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the

child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Id.* We will not reverse a finding terminating parental rights unless that finding is unsupported by the manifest weight of the evidence. *In re O.S.*, 364 Ill. App. 3d 628, 633 (2006). A judgment is against the manifest weight of the evidence if the opposite conclusion is clearly apparent, or the judgment is arbitrary, unreasonable, or not based on the evidence. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 15        Initially, we agree with the State that D.B.'s meager argument on appeal results in waiver. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating argument on appeal is waived by failing to cite to the record or to pertinent authority). Even absent waiver, the evidence supports the lower court's order terminating respondent's parental rights. Contrary to D.B.'s assertions, the best interest report does not support her argument that the lower court's decision is against the manifest weight.

¶ 16        The best interest report details the history of the case as follows. The minors came into care after D.B. left them home alone while she "went out." While D.B. attended counseling randomly throughout the life of the case, she failed to make "satisfactory progress." During the pendency of these matters, D.B. was often unavailable for monthly home visits to ensure the safety of the home.

She would avoid caseworkers as well as deny them entry into her home. On the occasion that caseworkers were able to enter the home, concerns such as an inoperative bathroom, open alcohol bottles within the reach of children, inadequate living space for seven children, and an open oven being used to heat the home were present. The caseworkers had not been able to conduct an in-home visit since October 2020. Unannounced visits to the residence led to the conclusion that D.B. no longer lived at the provided address. The report recommended the termination of D.B.'s parental rights.

¶ 17　　An addendum to the report detailed that a scheduled home visit on March 29, 2021, was unfruitful. When the caseworker arrived, no one answered the door. The caseworker called D.B. but she refused to let the caseworker into the home due to a "racoon problem." It was the caseworker's belief that D.B. no longer lived at the home. The oldest of D.B.'s children told the caseworker that D.B. was living with her boyfriend in a different state. D.B.'s whereabouts were unknown.

¶ 18　　At the time of the hearing, D.B. had not visited her children since October 2020. D.B. struggled to comply with court-ordered services for the duration of the case, failing to address requirements needed to safely and appropriately provide for the minors. D.B. also failed to comply with the required bimonthly random drug drops.

¶ 19　　The report also details the circumstances surrounding the minors and their relationship with D.B. C.R.'s relationship with D.B. was "strained." C.R. broke down to a caseworker, struggling with the fact that D.B. did not visit her and the inference therefrom that D.B. "does not want her" and did not love her. C.R. wished to be adopted by her current foster mother. The foster mother signed a permanency commitment.

¶ 20 K.R. also had a strained relationship with D.B. but did not exhibit "emotional struggles" due to the nature of the relationship. K.R. wanted to be adopted by her foster mother. The foster mother had signed a permanency commitment.

¶ 21 C.R. Jr. expressed an understanding that D.B. could not provide him permanency. He wanted to be adopted by his current foster parents. C.R. Jr. moved through numerous foster homes but found permanence with his current placement, developing an "unbreakable" bond with the foster parents. The foster parents signed a permanency commitment.

¶ 22 K.B. was two years old, had been in foster placement since birth, and did not exhibit a bond with D.B. K.B.'s medical providers were concerned he would need specialized daycare and schooling. K.B. was removed from his initial placement due to numerous concerns and moved through various placements until arriving at a licensed foster home on April 23, 2021, that was willing to provide permanency.

¶ 23 J.B. was one year old, had been in foster care since birth, and did not exhibit a bond with D.B. He referred to his foster mother as "mommy" and turned to her for affection.

¶ 24 A review of the evidence in these consolidated matters and the required application of that evidence to the appropriate statutory factors does not support D.B.'s assertion that the lower court erred. An opposite conclusion in this case is not clearly apparent, nor is the judgment arbitrary, unreasonable, or not based on the evidence. *In re D.F.*, 201 Ill. 2d at 498.

¶ 25 III. CONCLUSION

¶ 26 For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 27 Affirmed.